Tony VIELE, James L. Williams and
Raymond E. Stefans, Plaintiffs,

v.

Thomas W. DEVANEY, Lou Dimauro
and Tige Branch, Defendants.

Civil Action No. 14729.

Court of Chancery of Delaware,
New Castle County.

Submitted: March 4, 1996.
Decided: May 9, 1996.
Revised May 29, 1996.

Laurence V. Cronin and Joanne M. Shalk, of Smith, Katzenstein & Furlow, Wilmington, for Plaintiffs.

Thomas W. Devaney, Reno, Nevada; Appearing pro se for Defendants.

## OPINION

JACOBS, Vice Chancellor.

On December 7, 1995, the plaintiffs commenced this action pursuant to 8 *Del.C.* § 225, for a determination of the *de jure* officers and directors of Atlas Energy Corporation ("Atlas"). Specifically, the plaintiffs seek an adjudication that (i) plaintiffs Tony Viele ("Viele") and James Williams ("Williams"), together with Michael Annechino, Richard Johnson, and R.L. Pfeffer, Jr., constitute Atlas' *de jure* board of directors; and that (ii) Tony Viele and James Williams are Atlas' lawful President–Treasurer and Vice President–Secretary, respectively. These claims are contested by the defendants Thomas Devaney ("Devaney"), Lou Dimauro ("Dimauro") and Tige Branch ("Branch"), who were Atlas' directors and officers before the events that led to this action. The defendants claim continued lawful title to those corporate positions. Pursuant to a *status quo* order issued in a related case by the United States District Court in Nevada on December 8, 1995, the defendants have remained in *de facto* operating control of Atlas pending this Court's determination of the merits.

The case was tried on January 24–25, 1996. Mr. Devaney appeared *pro se,* and conducted the trial on the defendants' behalf. This is the Court's post-trial decision.

## I. *FACTS* [1]

Atlas is a Delaware corporation headquartered in Nevada and engaged in the oil and gas business. In 1987 defendant Devaney, who at that time was Atlas' controlling stockholder and Chairman of Atlas' board of directors, invited plaintiff Raymond Stefans ("Stefans") to join Atlas' board and to serve as its President. Beginning in 1987, Stefans served as Atlas' President, and later also as its Chief Financial Officer until 1994, at which time Stefans resigned from his board and management positions.

After his departure Stefans was to receive deferred compensation, including certain health benefits. Six months after his resignation, however, the relationship between Stefans and the Atlas board deteriorated. The board criticized Stefans for having retired without giving prior notice, and also for having failed to provide the board certain tax-related financial information that he had promised to furnish. For those reasons, during the spring of 1995 the board notified Stefans that Atlas would no longer provide for his health benefits; and in August of that year the board formally voted to deny Stefans all further compensation.

Needless to say, Stefans was upset with the board's actions, as he believed that he was entitled to the additional compensation, and that he had provided Atlas with the information the board had requested. In the

1. The facts set forth below are as found by the Court, based on a preponderance of the admissi- ble evidence. Other facts are set forth elsewhere in this Opinion where relevant.

spring of 1995, Stefans began soliciting proxies for written consents to remove the incumbent Atlas board and replace that board with his own director-nominee slate.

On October 16, 1995, Stefans, together with Williams, served written consents upon Atlas at its principal place of business, pursuant to 8 *Del.C.* § 228. Those consents purported to vote 1,037,345 shares to remove the existing Atlas board (the "Devaney board") and to elect a new board consisting of Messrs. Williams, Viele, Annechino, Johnson, and Pfeffer, Jr. (the "Stefans board"). The newly-elected Stefans board then voted to remove the defendants from their positions as officers, and elected Viele as Atlas' President and Treasurer, and Williams as its Vice President and Secretary. The validity of those actions[2] is an issue to be determined in this proceeding.

Later that same day, the Devaney board, which consisted of Messrs. Devaney, Branch and DiMauro, held a telephonic board meeting. The Devaney board instructed Messrs. Devaney and Branch to examine the Stefans proxies to determine whether those proxies represented a majority of Atlas' outstanding voting stock and were otherwise valid. The defendants' initial conclusion—memorialized in board minutes and made before they had examined any of the consents—was that the proxies submitted in favor of the October 16 consent action did not constitute the majority stockholder vote required to oust the incumbent board.

On October 17, 1995, Devaney sent a letter to the plaintiffs' counsel, advising him that the incumbent (Devaney) board had concluded that the Stefans consents did not represent a majority of Atlas' outstanding voting stock and, therefore, did not constitute valid shareholder action. The defendants proffered two reasons for that conclusion. The first was that the plaintiffs had wrongly assumed that 2,061,897 shares of common stock were eligible to vote, whereas in fact (defendants claimed), 2,552,784 Atlas shares were eligible to vote. The second reason was that several proxies submitted by the Stefans

group action were invalid on a variety of grounds.

Resting on their position that the October 16 consent action was a nullity, the defendants continued to hold themselves out as Atlas' directors and officers. In late October, 1995, Devaney filed a lawsuit against the plaintiffs and other members of the Stefans board in the United States District Court in Nevada, charging them with federal RICO violations, breach of fiduciary duty, tortious interference, civil conspiracy, and conversion. On December 8, 1995, at a hearing on a motion for a preliminary injunction, the Nevada defendants (who included the Delaware plaintiffs) argued that the Federal Court should defer ruling on the issues presented so that this Court could determine the issue of corporate control. Subsequently, the Federal Court in Nevada entered an order directing the parties to maintain the *status quo* pending the outcome of this Delaware action. That order remains in effect.

On December 11, 1995, Devaney noticed an Atlas stockholders meeting to be held on December 21, 1995. The agenda for the December 21 meeting consisted of two items: (i) to re-elect the Devaney board, and (ii) to re-incorporate Atlas in Nevada. On December 19, the Nevada Federal Court enjoined any attempt by the Devaney board to re-incorporate Atlas in Nevada, but did permit the December 21, 1995 stockholders meeting to go forward for the limited purpose of electing new directors.

At the December 21 stockholders meeting, Devaney and the other defendants re-elected themselves as Atlas' Board of Directors. The validity of that action is also an issue to be determined in this proceeding.

## II. *ANALYSIS*

There are three issues to be addressed: (i) the number of outstanding Atlas shares that were eligible to vote at the time of the October 16 consent action, (ii) the legal validity of certain proxies, voted in favor of the October 16 consent action, that the defendants have

---

**2.** The actions taken by written consent on October 16, 1995 are referred to in this Opinion as the "October 16 consent action."

challenged, and (iii) the validity of the actions taken by the defendants at the December 21, 1995 stockholders meeting.

At the heart of the control dispute is the validity of approximately 522,000 shares that the defendants claim to have authorized and caused to be issued during the two month period preceding the October 16 consent action. If these shares were validly issued before October 16, then the October 16 consent action was invalid for lack of the requisite majority vote, and the defendants would have been validly re-elected as Atlas' directors at the December 21 stockholders meeting. As discussed below, however, the evidence compels a finding that, in fact, the 522,000 shares were not issued until after October 16, 1995. The Court also finds that the defendants wrongfully refused to count several proxies that, when counted, would have given the plaintiffs the requisite voting majority at the time of the October 16 consent action. Finally, because the Devaney board also improperly counted those invalid 522,000 shares towards a quorum at the December 21 meeting, the action taken at that meeting was invalid for lack of a quorum. For these reasons, the plaintiffs' claim of title to corporate office must prevail.

## A. THE NUMBER OF OUTSTANDING ATLAS SHARES AS OF OCTOBER 16, 1995

### 1. The Evidentiary Status of the Stockledger

To support their position that over 2,500,000 Atlas shares were eligible to vote as of October 16, 1995, the defendants produced a stockledger that contained Devaney's handwritten notations. They claim that that annotated stockledger conclusively evidences the number of Atlas shares eligible to vote at the time of the October 16, 1995 consent action. The stockledger was a printout of an Atlas stockholders list dated September 1, 1995, upon which Devaney had made various handwritten notations. According to Devaney's testimony, those notations reflected changes in the number of outstanding Atlas shares that had occurred from August 1995 through October 1995. The defendants rely on that annotated stockledger as the exclu-

sive evidence of the Atlas shares eligible to vote at the time of the October 16 consent action.

Both sides rely on the September 1 printout insofar as it reflects that at least 2,072,337 shares were issued and outstanding. To that extent the printout provides undisputed evidence of the number of outstanding Atlas shares. Where the parties divide is on the question of whether Devaney's handwritten notations should be accorded any weight. Devaney testified that his annotations were consistent with Atlas' procedures for maintaining a stockledger. The plaintiffs respond that the annotations are highly irregular, self-serving, and entirely dependent upon the credibility of Devaney. For those reasons, plaintiffs argue, the Court must rely upon evidence beyond the stockledger (as annotated) to determine how many Atlas shares were eligible to vote at the time of the October 16 consent action.

■ Although a corporation is entitled to rely upon the stockledger to determine who are the stockholders entitled to vote, 8 Del.C. § 219(c), this Court is not limited to or bound by the stocklist in a proceeding to review a corporate election. In re Diamond State Brewery, Inc., Del.Ch., 2 A.2d 254, 257 (1938); Testa v. Jarvis, Del.Ch., C.A. No. 12847, Allen, C., mem. op. at 15–18, 1994 WL 30517 (Jan. 12, 1994); see also, In re Northeastern Water Co., Del.Ch., 38 A.2d 918, 923 (1944). Rainbow Navigation, Inc. v. Pan Ocean Navigation, Inc., Del.Supr., 535 A.2d 1357, 1359 (1987). Delaware courts have often looked beyond the stockledger to determine shareholder status, particularly with regard to voting rights. Testa v. Jarvis, mem op. at 16, n. 9, 1994 WL 30517. In this case there is ample reason not to accord Devaney's handwritten notations any evidentiary weight.

■ At all times, the annotated stockledger was under the defendants' exclusive control, and it was never produced, or ever witnessed by the plaintiffs, before the commencement of this litigation. The only independent "evidence" of the pre-October 16 changes, reflected in Devaney's handwritten annotations, consisted of four letters from

Atlas to its transfer agent, Oxford Transfer & Registrar ("OTR"). Those letters disclosed the changes and requested OTR to reflect them in Atlas' updated stockledger. However, as found elsewhere in this Opinion, those letters were not sent until *after* the October 16 consent action.[3] The lack of reliable independent evidence supporting Devaney's handwritten notations, the fact that the integrity of those notations depends entirely upon Devaney's own credibility, the obvious entrenchment implications of Devaney's handwritten changes, and the defendants' exclusive control of the stockledger at all times before this litigation arose—all these factors provide serious reason to question the validity of Devaney's notations.

Accordingly, the stockledger, as annotated, will not be regarded as the exclusive, definitive evidence of the number of outstanding Atlas shares entitled to vote. Extrinsic evidence will be considered. *See Arbitrium (Cayman Islands) Handels A.G. v. Johnson,* Del.Ch., C.A. No. 13506, Jacobs, V.C. (Jan. 5, 1996); *In re Canal Construction Co.,* Del. Ch., 182 A. 545 (1936). I now turn to that extrinsic evidence.

### 2. The Sierra Resources Stock

The plaintiffs first contend that the defendants improperly counted 18,000 Atlas shares that were held by Sierra Resources, a wholly-owned Atlas subsidiary, in determining the number of shares eligible to vote in the October 16 consent action. The plaintiffs are correct. A wholly-owned subsidiary is not permitted to vote its stockholdings in a parent company. *8 Del.C. § 160(c); Italo Petroleum Corp. of America v. Producers' Oil Corp.,* Del.Ch., 174 A. 276, 278–79 (1934). It is undisputed that Sierra Resources is a wholly-owned subsidiary of Atlas. It follows that the defendants incorrectly counted those Sierra Resources shares as eligible to vote for purposes of determining the validity of the October 16 consent action.

**3.** Stefans testified that Atlas never kept a stockledger during his tenure, and that the corporation kept track of the number of shares issued and outstanding through its transfer agent, OTR.

### 3. The Contested Share Issuance

■ The pivotal—and most material—dispute concerns the 521,855 shares that were purportedly newly issued, and the 44,000 shares that were purportedly canceled, during the two months preceding the October 16 consent action (the "contested stock issuances"). As earlier noted, the evidence claimed to support the contested stock issues are four letters that defendants say were sent to OTR before October 16, 1995. Those letters, dated August 20, October 3, October 10, and October 11, 1995, directed OTR to issue (and cancel) specified shares of Atlas stock. Of the approximately 522,000 disputed shares, over 320,000 were issued to the Atlas Energy Deferred Compensation Trust, a trust controlled by Devaney. The remaining shares were issued (i) to Devaney's lawyer, (ii) a company controlled by Devaney's brother, (iii) to Branch and to Branch's son, and (iv) to another Atlas employee. Of the 44,000 shares of stock allegedly canceled, 40,000 belonged to R.L. Pfeffer, one of Stefans' nominees to the plaintiffs' slate of directors.

The plaintiffs argue that the contested actions are invalid and that the shares resulting from those actions should not be counted in determining the number of shares eligible to vote at the time of the October 16 consent action. The plaintiffs advance four reasons: (1) the 522,000 shares were not issued until after the October 16 consent action, (2) there is no evidence that Atlas received consideration for the contested share issuance, (3) the contested share issuance to the members of the Devaney board and their confederates was an invalid effort by the defendants to entrench themselves and to nullify retroactively an otherwise valid consent action; and (4) the defendants' conduct after the October 16 consent action evidences that they knew the disputed 522,000 shares had not been validly issued. Although in my opinion all of these contentions are meritorious, I need address only two of them.

As discussed below, OTR's employees testified that OTR did not receive the letters evidencing Atlas' changes to its stockledger until four days *after* the consent action.

First, there is no credible evidence that defendants sent, or that OTR received, any of the four letters authorizing the issuance and cancellation of the disputed shares until October 20, 1995—four days *after* the plaintiffs' October 16 consent action. On that date (October 20), Branch, as Atlas' appointed secretary, faxed Lori Livingston, OTR's President, copies of the four letters, accompanied by a cover letter that stated:

*Dear Lori:*

*By fax I hand you copies of the hard copies I sent to Sally. I am attempting to reach our attorney to have him fax you a letter giving his opinion on this ·fiasco. Time is critical and I thank you for the extra effort.*

(emphasis added.)

Neither Livingston nor Sally Flaucher (the OTR employee referred to in the message) recalled having ever seen the four letters before October 20, 1995. Ms. Livingston testified that OTR did not regard these shares as issued and outstanding until October 20–23, again *after* the October 16 consent action. The preponderance of the credible evidence demonstrates that the actions taken by defendants to issue and cancel the contested Atlas shares did not occur until October 20, 1995. *See* Plaintiff's Trial Exhibit 32. Livingston Dep. at 15–23, 36–53, Flaucher Dep. at 16–21, 24, 30–34.

Second, the *bona fides* of the board authorization for the issuance and cancellation of the contested shares is highly suspect for other reasons. Except for the shares issued to the Devaney-controlled trust, there is no evidence that the board authorized the issuance of the other disputed Atlas shares during the two months preceding the October 16 consent action.[4] Moreover, the defendants never proved that Atlas ever received any consideration for those shares. Finally, the

fact that the recipients of the newly issued stock were the defendants, their relatives, an Atlas employee loyal to Devaney, and a trust that Devaney controlled, only further confirms that the contested stock issuance had no independent business purpose. Rather, it was a desperation effort to defeat the October 16 consent action by placing newly issued shares into friendly hands after the fact.

For these reasons the Court concludes that the contested stock issuance (and the cancellation of the Pfeffer shares) all post-dated the October 16, 1995 consent action and were done in response to it. The only contrary evidence is Mr. Devaney's testimony, which I find entirely lacking in credibility.

The Court therefore concludes that the approximately 522,000 disputed shares were invalidly issued, and that the 44,000 shares purportedly canceled were invalidly canceled (and hence remained validly issued), at the time of the October 16 consent action.[5]

\* \* \*

The defendants argue, in the alternative, that even if the Stefans proxies represented a majority of the shares entitled to vote, the October 16 written consent action was, nonetheless, legally ineffective because certain of the consents were legally invalid. Specifically, the defendants challenge five sets of proxies.[6] I turn now to their specific proxy challenges.

### B. *THE VALIDITY OF THE CHALLENGED PROXIES*

#### 1. *The Stefans Proxy*

Although Stefans owned 376,742 shares of Atlas stock, the defendants counted only 42,754 of those shares for purposes of the October 16 consent action. Specifically, the defendants did not count approximately 334,000 Stefans shares held in the name of

---

4. The defendants suggest that OTR received these letters before October 16, 1995 but did not open the envelopes because Atlas still owed OTR money. But the defendants have offered no credible evidentiary support for that contention. The only evidence these letters were sent as dated is Devaney's testimony, which he fails to support with any independent documentation that the letters were actually sent before the October 16 consent action.

5. Because the defendants were no longer directors and officers after October 16, they lacked any power to cause Atlas to issue new shares or to cancel any outstanding shares.

6. The rest of plaintiffs' proxies are conceded to be valid. The defendants do not dispute that 650,040 shares were properly voted on behalf of the consent action.

"R.E. Stefans," because Stefans signed the proxy as "Raymond E. Stefans." The defendants claimed that they could not necessarily conclude that the shares registered to "R.E. Stefans" were all owned by "Raymond E. Stefans."

That argument does not even pass the blush test. It is undisputed that Stefans held shares in the name "Raymond E. Stefans" as well as "R.E. Stefans," and that those two persons were one and the same. Mr. Stefans signed the proxy "Raymond E. Stefans" intending to grant the authority to vote all 376,742 of his shares. Given the uncontroverted record, the defendants had no basis to question the validity of the Stefans proxy, and neither does this Court. *Atterbury v. Consolidated Coppermines Corp.*, Del.Ch., 20 A.2d 743, 747 (1941); *see also* David A. Drexler, Lewis S. Black, Jr., and A. Gilchrist Sparks, III, *Delaware Corporate Law and Practice* § 25.09 (1996).

### 2. *The Pfeffer Proxy*

■ The defendants also rejected a proxy, representing 40,000 shares, executed by R.L. Pfeffer, Jr., on the ground those shares had previously been canceled. However, defendants introduced no evidence that the board had ever formally authorized the cancellation of these shares before October 16 or any basis for the purported cancellation. The defendants' letter instructing OTR to cancel the Pfeffer shares, while dated October 10, was never delivered to OTR until it was "faxed" on October 20, 1995. Accordingly, the Pfeffer shares were eligible to vote for the October 16 consent action, and should have been counted in its favor.

### 3. *The Williams Proxy*

The defendants now concede that the Williams proxy representing 80,000 shares of Atlas stock was validly voted in favor of the October 16 consent action.

### 4. *The Katz Proxies*

The defendants rejected the Katz proxies, representing 5,168 shares, because of an alleged bankruptcy action involving the Katzes. At trial, the defendants offered no evidence to support that position. Proxies are pre-sumed to be valid. *Parshalle v. Roy*, Del. Ch., 567 A.2d 19, 23 (1989). The Katz proxies were validly executed and the defendants made no showing at trial to rebut that presumption. Therefore, the Katz proxies were valid and should have been counted.

### 5. *The Dorn Proxy*

At trial Ms. Dorn testified she owned 8,149 shares of Atlas stock, and she brought the original stock certificate with her as proof of ownership. The stock certificate is strong evidence that Dorn owned those shares. *Smith v. Universal Service Motors Co.*, Del. Ch., 147 A. 247 (1929). The defendants now concede that the Dorn shares are validly issued and outstanding.

The defendants claim that they rejected the Dorn proxy because Dorn was not listed as a stockholder on the company's stockledger. They contend that because Ms. Dorn's name was not on the stockledger at the time of the consent action, her shares were properly not counted, even though the extrinsic trial evidence established that she was a stockholder at that time. The argument has no merit. This Court has determined that the annotated stockholder list is not reliable. The credible evidence shows that Ms. Dorn's shares were validly issued and outstanding. Her proxy should, therefore, have been counted in favor of the consent action.

### 6. *Other Alleged Proxy Violations*

Finally, the defendants attack the validity of the entire Stefans proxy solicitation (as distinguished from challenging specific proxies), on several different grounds, none of which is supported in fact or law.

■ First, the defendants contend that all of Stefans proxies were invalid as a matter of form, because on their face they did not provide shareholders a choice of which competing slate to vote for. Relying on *Pabst Brewing Co. v. Jacobs*, D.Del., 549 F.Supp. 1068, *aff'd*, 3d Cir. 707 F.2d 1392 (1982), the defendants assert that Delaware law requires such a choice. However, *Pabst Brewing Co.* involved an application of the federal proxy rules. 549 F.Supp. at 1074–77; *see also* 17 C.F.R. § 240.14a–4(b)(2). Atlas is not a re-

porting company under the federal securities laws, and was not subject to the federal proxy rules. The Stefans' solicitation was governed by Delaware law, which does not prescribe a particular form of proxy. *See Gow v. Consolidated Coppermines Corp.*, Del.Ch., 165 A. 136 (1933). Therefore, the fact that no choice between competing candidate slates was provided on the face of the proxies will not cause those proxies to be invalid. The choice that was afforded—to vote (or not vote) in favor of the Stefans slate—was sufficient.

■ Second, the defendants claim that the proxy solicitation did not conform to 8 *Del.C.* § 228(c), which requires that the consents be delivered to the corporation within sixty days of the earliest dated consent. The defendants insist that because the earliest proxies were executed in early June, all proxies received after August 16, 1995 were not timely delivered and were, therefore, invalid. However, the defendants confuse the time limit for submitting written consents with the time limit for a valid proxy. By statute a proxy may be valid for up to three years unless the parties contract otherwise. 8 *Del.C.* § 212(c). The proxies submitted here were executed within this three year time period. The plaintiffs' written consent was executed on October 12, 1995, and was delivered to Atlas on October 16, 1995, four days later. Thus, the consent action complied with the sixty-day time requirement of 8 *Del.C.* 228(c).

Third, the defendants assert that the proxy materials contained material misdisclosures and non-disclosures.[7] Apart from the fact that the plaintiffs were not officers, directors or controlling stockholders of Atlas (and, hence, were not in a fiduciary relationship with the corporation or its other shareholders) at the time of the solicitation,[8] the defendants have not established any factual

predicate for their disclosure claims. Accordingly, those claims fail as a matter of evidence and proof.

Fourth, defendants argue that the plaintiffs engaged in vote buying in their October 16 consent action. However, the defendants provide only speculative assertions, but no specific proof, that the plaintiffs engaged in such activity.

\* \* \*

For the foregoing reasons, the Court determines that as of October 16, 1995, 2,061,-897 Atlas shares were eligible to vote for the October consent action, including Ms. Dorn's 8,149 shares of Atlas stock not reflected on the stock ledger. The plaintiffs needed only a majority—1,030,949 of those shares—to be voted on their behalf for the October 16 consent action to be valid. The defendants do not dispute that 650,040 shares (including the Williams proxy) were properly voted, and the Court concludes that the 387,305 additional shares the defendants wrongfully rejected[9] were also validly voted on the plaintiffs' behalf. The sum of the contested and uncontested shares voted on the plaintiffs' behalf—1,037,345 shares—constituted a majority of outstanding Atlas shares eligible to vote in the October 16 consent action. Therefore, the legal effect of the October 16 consent action was to remove the Devaney board and its officers, and to replace them with the plaintiffs' slate of directors who then validly appointed new officers for Atlas.

## C. *THE VALIDITY OF THE SPECIAL SHAREHOLDERS MEETING*

■ The defendants next claim that even if the October 16 consent action validly removed them as directors and officers of Atlas, the plaintiffs' victory was short-lived, because the defendants became reinstated to

---

**7.** The alleged disclosure violations are that (i) the solicitation failed to mention any changes in Atlas management other than Viele becoming Atlas' President; (ii) Pfeffer, Jr.'s (alleged) record as a convicted felon was not disclosed; (iii) Stefans failed to disclose his role in the proxy solicitation; and (iv) Stefans failed to disclose his early resignation from the Atlas board.

**8.** *See Zirn v. VLI Corp.*, Del.Ch., C.A. No. 9488, Hartnett, V.C., 1992 WL 136450 (June 10, 1992),

*rev'd on other grounds*, Del.Supr., 621 A.2d 773 (1993).

**9.** The contested shares improperly rejected by the defendants consisted of the 333,988 shares held by Stefans, the 40,000 shares held by Pfeffer, the 5,168 shares held by the Katzes, and the 8,149 shares held by Dorn.

their former positions at the December 21, 1995 shareholders meeting. The defendants' argument necessarily presupposes that a valid quorum existed at the December 21 meeting. However, that premise is incorrect.

On December 11, 1995 Devaney noticed a special stockholders meeting for December 21, 1995 pursuant to the Atlas by-laws. The defendants claim that 2,594,192 Atlas shares were issued and outstanding at that time, and that 1,425,871 of those shares were present at the December 21 meeting. Those 1,425,871 shares, the defendants argue, were enough to constitute a quorum. In addition, the board concluded (after their quorum determination) that an additional 600,000 shares were present because of the attendance of Laura Davis, a paralegal and assistant to the plaintiffs' counsel, as proxy for shares held by Williams. These arguments labor under two fatal infirmities.

First, the defendants' determination of the scope of the Baker proxy's representation was incorrect. Ms. Baker attended the meeting and explicitly told Devaney and others that she was representing only one (1) share of stock on Mr. Williams' behalf.[10] The defendants, nonetheless, counted Ms. Baker's proxy as representing *all* the shares that were registered in Williams' name, and then proceeded to cast their votes to elect themselves as Atlas' directors.

The defendants contend, as a legal matter, that once a proxy appears at a meeting on behalf of a shareholder-principal, all shares owned by the principal are deemed to be present. For this proposition they cite *Duffy v. Loft*, Del.Ch., 151 A. 223, *aff'd*, Del.Supr., 152 A. 849 (1930). *Duffy* does not support any such broad rule of law. Indeed, in *Duffy* the proxy holder held himself out as representing a specific number of shares when he attended the meeting. So did Ms. Baker here. She explicitly stated that she came to the meeting to represent *one* share of stock,

and the defendants understood the limits of her representation in allowing her into the meeting. It would be inequitable to allow the defendants, having accepted the limits of Ms. Baker's representation, retroactively to broaden Baker's limited proxy in order to achieve a quorum that would not otherwise exist. *See Schnell v. Chris–Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971).

Second, for purposes of determining that a quorum existed, the defendants counted the approximately 522,000 disputed shares that this Court has found were invalidly issued. Deducting those shares from the 1,425,871 total results in 903,016 shares validly present for the stockholders meeting—well short of the 1,030,949 shares needed to constitute a quorum.[11]

Therefore, all the actions taken at the December 21 meeting are void because no quorum was ever attained.

## III. *CONCLUSION*

Having heard the trial witnesses and reviewed all the evidence, the Court finds that only 2,080,486 shares of Atlas stock were issued and outstanding at the time of the October 16 consent action, and that 2,061,897 of those shares were eligible to vote. A majority of those 2,061,897 shares were voted in the October consent action to remove the Devaney board and its officers. The attempt by Devaney and the other defendants to overturn the results of that consent action at the December 21, 1995 shareholders meeting was invalid, because that meeting lacked the requisite quorum. The Court, therefore, determines that (i) plaintiffs Viele and Williams, together with Messrs. Annechino, Johnson and Pfeffer, Jr., constitute Atlas' lawful board of directors; and that (ii) Viele is Atlas' President and Treasurer and Williams is Atlas' Vice President and Secretary.

---

10. Ms. Baker was not allowed to bring a court reporter to the stockholders meeting but was permitted to tape record the proceedings. That tape and its transcript were introduced into evidence at trial.

11. No changes, save the invalid shares issuances and cancellations, were made to Atlas' stockholder list during the period between the October 16 consent action and the December 21 shareholders meeting. Therefore, only 2,061,897 shares remained eligible to vote, of which half—1,030,949 shares—were required to constitute a quorum.

The attached Order implementing the rulings herein is entered concurrently herewith.