# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SIME STANTIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0040-SEM |
| | ) | |
| HIREAPP TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Final Report: July 2, 2025
Date Submitted: June 25, 2025

## <u>FINAL POST-TRIAL REPORT</u>

Rafael X. Xahralddin-Aravena, Sean M. Brennecke, LEWIS BRISBOIS BISGAARD & SMITH LLP, Wilmington, DE; OF COUNSEL: Oscar A. Gomez, Jennifer S. Roldan, EPGD ATTORNEYS AT LAW, P.A., Miami, FL; *Counsel for Plaintiff Sime Stantic.*

Samuel T. Hirzel, II, Elena M. Sassaman, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; *Counsel for Defendant HireApp Technologies, Inc.*

**MOLINA, Senior Magistrate**

Through this action, a purported stockholder seeks to inspect a company's books and records to assess its financial health and investigate possible mismanagement. The company has refused inspection, arguing that the plaintiff is not a stockholder. I agree. The plaintiff agreed to, and did, separate from the company, and his shares were properly cancelled. He, therefore, lacks standing, and his request for a court-ordered inspection of books and records must be denied. I have also concluded that the parties should bear their own fees, but that costs should be shifted in the defendant's favor as the prevailing party.

## I. BACKGROUND

This is a books-and-records proceeding initiated by Sime Stantic (the "Plaintiff") against HireApp Technologies, Inc. (the "Defendant"). This action was initially stayed, at the Plaintiff's request, while the parties attempted to negotiate a resolution.[1] In February of this year, I learned those efforts were unsuccessful and we moved full steam ahead to our expedited trial on June 25.[2] This is my expedited post-trial decision.

I begin this report with a brief background, which I take from the parties' stipulations in the pretrial order and from the record developed in advance of and

---

[1] *See* Docket Item ("D.I.") 3. The parties' joint exhibits are cited as JX__.

[2] D.I. 9–10, 15.

during trial, at which seventy-three exhibits were admitted into evidence and two witnesses—the Plaintiff and Nemanja Stefanovic—testified.

## A. The Parties

The Defendant is a Delaware corporation, founded in 2019, with the aspiration of providing a "cutting-edge staffing-as-a-service platform that connects high-end hospitality businesses with qualified professionals quickly and efficiently."[3] Toward this goal, the Defendant has a software platform allowing businesses to access a pool of qualified candidates and manage and maintain their workforce, without the time and expense of a more complex recruiting process.[4]

The Plaintiff was a co-founder of the Defendant and became a stockholder of record of 3,550,000 shares of the Defendant's common stock through a purchase agreement dated July 18, 2019.[5] The purchase price reflected on the agreement was *de minimis* ($0.00001 per share, for a total of $35.50),[6] but the parties agree the Plaintiff had made a sizeable financial investment in the Defendant and dedicated

---

[3] JX61 at 2.

[4] *Id.*

[5] JX2. The Plaintiff testified that the agreement was backdated to 2019 and signed much later. *See also* JX29 (email chain appearing to confirm backdating). Neither party, however, contests the Plaintiff's stock ownership, nor that it was subject to the terms in this agreement. The parties also agree that the Plaintiff's purchase was subject to a vesting schedule through which 1,996,875 shares were vested at the time of the termination and cancellation.

[6] JX2 at 1.

"significant time, industry connections, and expertise to build [the Defendant] into a viable and valuable business."[7]

Given his expertise, the Plaintiff also served the Defendant as a consultant and board member. Through a consulting agreement dated July 18, 2019, the Plaintiff agreed to provide forty hours of work for merely $1.00 a year.[8] In actuality, the Plaintiff worked without compensation for the first two years of the business. At or around the two-year mark, the Plaintiff's compensation grew to $8,000.00 per month, which was ultimately increased to $15,000.00 per month.[9] In connection with his consulting agreement, the Plaintiff also signed a confidentiality agreement, which included a twelve-month non-compete provision.[10] The Plaintiff was also a director on the Defendant's three-member board of directors. But, as of September 3, 2024, and as explained in more detail below, the Plaintiff was terminated from those roles.[11]

---

[7] D.I. 31 ("Pretrial Order") at p. 7 ¶ 2.

[8] JX1 at HireApp-000375, -381 ("For [s]ervices rendered by [the Plaintiff] under this [a]greement, the [Defendant] shall pay [the Plaintiff] at the rate of $1 per year, payable at the end of each year.").

[9] JX59 at 24:5–11 (Q: "What were you [the Plaintiff] paid as a consultant to [the Defendant]?" A: "First two years, nothing; next two years, $8,000 a month, and . . . . [w]hen the investors came, they gave me [the Plaintiff] $15,000 a month.").

[10] JX3 at HireApp-000367.

[11] JX45. The Plaintiff now serves as the director of operations for Novu Staffing, a position he has held since September 2024. JX58.

Another key player in the Defendant's business is Nemanja Stefanovic, its chief executive officer.[12] The Plaintiff and Mr. Stefanovic co-founded the Defendant and worked closely together for several years before they began to envision a different future for the business.

## B. The Rift

The Plaintiff and Mr. Stefanovic worked in tandem in the early years. But beginning in or around 2023, their divergent visions for the Defendant's future drove them apart. A turning point in their business relationship appears to be a May 2023 investment from the Dutch company SCV Technology Fund III Coöperatief U.A. ("SCV"). On May 9, 2023, SCV made a $1.5 million investment in the Defendant in exchange for seed-series preferred stock.[13] That investment brought in more voices and interests, and the company began to turn in a different direction than the Plaintiff envisioned.

For example, in early 2024, Mr. Stefanovic "began stating that the hospitality business was not scalable and did not represent a suitable product-market fit for" the Defendant.[14] The future, per Mr. Stefanovic, was in further development of the Defendant's platform. The Plaintiff disagreed, expressed his concerns about this

---

[12] JX61.

[13] JX8–9.

[14] Pretrial Order at p. 8 ¶ 7.

direction, and made repeated requests to Mr. Stefanovic for financial reports and greater insight into the company's management.[15] These requests were a change in course for the Plaintiff who had largely worked on bringing in and sustaining business, rather than engaging in bigger picture strategic and management decisions. As he grew more concerned about the future of the business, the Plaintiff increased his involvement at the management level. For example, on or about April 3, 2024, the Plaintiff expressed his concerns regarding the Defendant's management to its board of directors.[16] A few weeks later, on or about April 26, 2024, the Plaintiff even "traveled to Serbia to meet with [Mr.] Stefanovic in person to discuss the [Defendant's] current position and other relevant stated concerns."[17]

Those meetings and discussions did not assuage the Plaintiff's concerns. The Plaintiff grew frustrated and disillusioned by the Defendant's change in course, especially after its May 2024 acquisition of a Serbian entity, Hire Technologies D.O.O. That acquisition raised several concerns in the Plaintiff's mind; he was worried about, for example: Mr. Stefanovic's relationship to the company; the Defendant's payments or transfers of funds to that company; the logistics of moving

---

[15] JX10; Pretrial Order at p. 8 ¶ 8.

[16] Pretrial Order at p. 8 ¶ 9.

[17] *Id.* ¶ 10; *see also* JX11 (reflecting the Plaintiff's concerns in a May 3, 2024 email).

operations into Serbia; and the culture of the Defendant going forward as a U.S. versus Serbian enterprise.[18]

Although they had different visions, Mr. Stefanovic attempted to address the Plaintiff's access/control concerns by providing the Plaintiff with insight into the Defendant's dealings shortly after the Serbian acquisition. On or about May 30, 2024, Mr. Stefanovic sent the Plaintiff spreadsheets reflecting the Defendant's 2023 expenses and the year-to-date 2024 expense spreadsheet for the Defendant, both of which contained accounting of the Defendant's U.S. and Serbian accounts and disclosed the expenses of the Serbian entity.[19]

### C.    The Split

These disclosures were not enough to resolve the Plaintiff's concerns. And it quickly became clear to everyone that something needed to change. As co-founders, the Plaintiff and Mr. Stefanovic worked hard to find common ground and a path forward. Mr. Stefanovic made the first proposal. He proposed that the Plaintiff transition from the operational level into "a more strategic position within the [b]oard of [d]irectors[.]"[20] He acknowledged that the Plaintiff's "extensive expertise has greatly benefitted the organization in the past," and shared his belief that "it will

---

[18] *See* JX13; *see also* JX14–16 (Mr. Stefanovic responding).

[19] *See* JX64; JX69.

[20] JX16 at HireApp-000453.

continue to do so in this new capacity."[21] Specifically, he was looking for the Plaintiff to remain actively involved in the higher-level strategic planning and management, "while empowering the operational team to function independently and efficiently."[22]

Inherent in this proposal was the expectation that Mr. Stefanovic's vision would prevail; the Defendant would reduce its role in the industry and region the Plaintiff championed and would increase its focus on development. Cognizant that this shift was not the Plaintiff's preference, Mr. Stefanovic included in his proposal a buyout of sorts. Mr. Stefanovic proposed that the Plaintiff receive $5,000.00 per month for his continued role on the board for ten months, plus a $10,000.00 monthly incentive for the same ten-month period for the Plaintiff to return his vested shares.[23]

The Plaintiff was "deeply disappointed with" this proposal and unequivocally rejected it on June 7, 2024.[24] He explained that he could not continue in a business where he would have restricted access, including with clients he procured. He also expressed concerns about remaining bound by a personal guaranty he signed for the

---

[21] *Id.*

[22] *Id.* at HireApp-000454.

[23] JX17. This first proposal valued the Plaintiff's shares around $100,000.00, based on "[t]he amount of money that [the Defendant] actually [could] pay out." JX60 at 71:6–21.

[24] JX18.

Defendant's business.[25] Finally, the Plaintiff pushed back on the level of financial compensation offered and seeming lack of support that would be provided to him to carve off and continue the rejected aspect of the Defendant's business.[26]

The Plaintiff did not, however, leave the negotiating table. On June 12, he made an offer of his own. Through email to Mr. Stefanovic, the Plaintiff shared his understanding that his departure was best for all involved and that he was "glad that everyone will go out on their own to do what they believe in."[27] To make that work, he proposed a few things: that he (1) retain certain clients he would otherwise be barred from working with under his non-compete, (2) be removed as personal guarantor, (3) be paid $25,000.00 per month for July and August 2024, with his exit finalized by September 1, 2024, and (4), "[a]s part of the transition, . . . hand over all [his] . . . shares" of the Defendant (the "Counteroffer").[28] The Plaintiff asked that Mr. Stefanovic confirm agreement and promptly schedule a board meeting.

On June 12, Mr. Stefanovic responded by email indicating that "[i]n principle" he agreed with the Counteroffer, although they needed to discuss one client and hash out the terms.[29] He offered to meet with the Plaintiff that weekend, whenever

---

[25] *Id.*

[26] *Id.*

[27] JX19.

[28] *Id.*

[29] JX20.

convenient for him. The parties were, presumably, able to connect because on June 18, the Plaintiff wrote to Mr. Stefanovic to "confirm [their] agreement" before sending it to the final board member and scheduling a meeting (the "Confirmation").[30] In the Confirmation, the Plaintiff reiterated the terms from the Counteroffer, with one modification—the client Mr. Stefanovic raised concerns about would stay with the Defendant "for now," but the Plaintiff could still solicit that client and work to transition it over to his new enterprise.[31] In pertinent part, the Confirmation reiterated the Plaintiff's agreement to have his shares "handed back" by September 1.[32]

On June 19, the Plaintiff sent the Confirmation to the remaining board member.[33] The Plaintiff explained that he and Mr. Stefanovic were "agreed almost entirely on how to proceed[,]" and he shared the agreed-upon itemized list.[34] Regarding his shares, the Plaintiff again explained that they would "be handed back by" September 1.[35] The final board member asked questions about the deal, including the monetary payouts to the Plaintiff for July and August, which the

---

[30] JX21.

[31] *Id.*

[32] *Id.*

[33] JX23.

[34] *Id.*

[35] *Id.*

Plaintiff explained in response were "symbolic exit pay[.]"[36] With that explanation, the board met and finalized the separation. Ultimately, it had five parts: (1) the Plaintiff would "hand back" his stock, (2) the Defendant would permit the Plaintiff to carve out his preferred portion of the enterprise by transferring certain clients to him and terminating, and permitting the Plaintiff to hire and work with, some of the Defendant's current employees, (3) the Plaintiff would receive $50,000.00, half in July and half in August, (4) the Plaintiff would be relieved of his personal guarantee, and (5) the parties would be separated and on their own way by September 1st (the "Agreement").

The Defendant's counsel got to work preparing written agreements to memorialize the Agreement. On July 11, 2024, Mr. Stefanovic sent draft documents to the Plaintiff, including a resignation letter for the Plaintiff, a repurchase agreement for the Plaintiff's shares, and a founder separation agreement.[37] But, upon review, the Plaintiff had concerns about the non-compete and his ability to develop his business after separation.[38] He also noted that a few clients appeared to be missing from the list in the drafts and that his additional compensation and removal as

---

[36] JX27.

[37] JX65; *see also* JX28 (email chain and draft documents).

[38] *See* JX31.

guarantor should be reflected.[39] By email dated July 24, Mr. Stefanovic requested that the drafts be revised to make the corrections requested by the Plaintiff.[40]

All of Mr. Stefanovic's concerns were addressed and the documents were revised. By August 2, 2024, the final documents were ready for signature and were sent to the Plaintiff through Dropbox Sign.[41] Through a WhatsApp message on August 12, 2024, the Plaintiff told Mr. Stefanovic he would be "back to California on Wednesday"—August 14—"and [would] send [him] the signed documents."[42] Ultimately, August 14 came and went, and the Plaintiff still had not signed. But, on August 16, the Plaintiff reached out about being removed from the guaranty and, in doing so, explained he was "on the verge of signing [his] release documents[.]"[43] Around this time, the Plaintiff also communicated with third parties about the parties' deal and plan moving forward, indicating the deal was final.[44]

---

[39] *Id.*

[40] JX33.

[41] JX35. The final version of the founder separation agreement reflected $50,000.00 as "final compensation" to the Plaintiff, JX70, while the stock repurchase agreement reflected the repurchase price as $0.00001 per share for a total of $15.53. JX71.

[42] JX36.

[43] JX37. Removal proved a bit more complicated than contemplated, but the parties worked their way through it. *See* JX38.

[44] JX40.

Then came August 29. Despite these representations and indications, on August 29, the Plaintiff attempted to reverse course.[45] Through email to one of the Defendant's board members and the representative of SCV—excluding Mr. Stefanovic—the Plaintiff tried to back out of the deal. He explained that "[o]ver the last month, [he] looked at everything from a different angle," and decided "with a clearer head, . . . to change [his] mind about [his] departure from the company, and [was then] consulting with [his] attorney on the next steps."[46] As for the reason he changed his mind, he represented that he was "too exhausted and too blinded" in trying to save the company that he "lost the perspective over what [he] invested" in the business.[47]

Not only did this email conflict with the Plaintiff's earlier representations, but it was also sent after the Plaintiff had already received the monetary consideration he expected from the Agreement ($50,000.00). He received the first $25,000.00 payment on July 31, 2024 (initiated by Mr. Stefanovic), and he initiated the second payment to himself on August 26, 2024, three days before his email.[48] All that was left in the Agreement to be accomplished was: (1) the guaranty issue, which was resolved on September 4, (2) the transfer of employees, which occurred by

---

[45] JX44.

[46] *Id.*

[47] *Id.*

[48] JX34; JX39.

September 1, and (3) the handing back of the Plaintiff's shares, which the Defendant effectuated by cancellation on September 4.[49]

Before this final step, and while he was protesting the deal he made, the Plaintiff was making (or attempting to make) purchases on, and payments through, his company credit card, which caused the Defendant concern.[50] Those transactions led the Defendant to issue a letter of termination to the Plaintiff on September 3, 2024, terminating him from his positions as consultant and director.[51]

### D. The Demands

On September 20, 2024, the Plaintiff demanded to inspect the Defendant's books and records under Section 220 of the Delaware General Corporation Law.[52] The Defendant responded through counsel on September 27, refusing to permit any inspection.[53] Specifically, the Defendant explained that the Agreement had been fully consummated, leaving the Plaintiff with no standing to seek inspection of books and records.[54]

---

[49] *See* JX50; JX66. The cancellation was noted as a "buyback" for $50,000.00. JX50 at HireApp-000418; *accord* JX55 (stock ledger as of March 5, 2025, on which the Plaintiff is not reflected).

[50] *See* JX62–63 (charts reflecting card charges).

[51] JX45.

[52] JX49.

[53] JX50.

[54] *Id.*

On October 23, 2024, the Plaintiff sent a second demand to inspect the same books and records requested in September (the "Demand").[55] In the Demand, the Plaintiff again self-identified as a stockholder, with the support of his initial stock certificate, and he provided no response or counter to the standing issue raised by the Defendant. On October 28, the Defendant, through counsel, reiterated its September response and declined the request for inspection.

As referenced above, the Plaintiff then initiated this action on January 14, 2025, and after a brief stay, it was set for an expedited trial which I held on June 25. This is my final post-trial report.

## II.  ANALYSIS

Through this action, the Plaintiff seeks a court-ordered production of the books and records requested in the Demand under 8 *Del. C.* § 220.[56] The parties' primary, and gatekeeping, dispute is whether the Plaintiff has standing. As I will explain, he does not. Costs should be shifted to the Defendant as the prevailing party, but the parties should bear their own expenses, including attorneys' fees.

---

[55] JX51.

[56] Because the Demand was served before February 17, 2025, the retroactivity date for the recent amendments to Section 220, the prior version applies. *See* Del. Sen. Sub. 1 for S.B. 21, 153rd Gen. Assem. § 3 (Mar. 24, 2025) ("Sections 1 and 2 of this Act take effect on the enactment of this Act and apply to all acts and transactions, whether occurring before, on, or after the enactment of this Act, except that Sections 1 and 2 of this Act do not apply to or affect any action or proceeding commenced in a court of competent jurisdiction that is completed or pending, or any demand to inspect books and records made, on or before February 17, 2025.").

### A. The Plaintiff does not have standing for a court-ordered inspection.

"To inspect books and records under Section 220, a plaintiff must establish by a preponderance of the evidence that the plaintiff is a stockholder, has complied with the statutory form and manner requirements for making a demand, and has a proper purpose for conducting the inspection."[57] The first part of this three-part test imposes a current ownership requirement. As emphasized recently by Vice Chancellor Will:

> The legislative intent behind the current ownership requirement of Section 220(c) is not difficult to glean. A plaintiff must have first made a demand at a time when she was a stockholder. And the plaintiff must continue to be a stockholder when she initiates Section 220 litigation in this court.[58]

This dual requirement is why many stockholder plaintiffs will file placeholder books-and-records actions to preserve their standing pending a contemplated merger or acquisition. Here, the Plaintiff needed to prove that he was a stockholder both at the time of the Demand and at the time this litigation was filed. He failed to do so.

---

[57] *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020), *judgment entered*, (Del. Ch. 2020). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *48 n.478 (Del. Ch. Feb. 12, 2018), *rev'd in part on other grounds sub nom., Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 204 A.3d 482 (Del. 2019) (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)).

[58] *Swift v. Hou. Wire & Cable Co.*, 2021 WL 5763903, at *4 (Del. Ch. Dec. 3, 2021).

In so holding, I look beyond the original stock certificate, relied upon by the Plaintiff, and the current stock ledger, relied upon by the Defendant, which are in conflict. Typically, either would be strong, or even conclusive, evidence, "as Delaware courts require strict adherence to the Section 220 inspection demand procedural requirements."[59] But this Court has "exclusive jurisdiction to determine whether or not the person seeking inspection is entitled to the inspection sought."[60] Thus, the Delaware Supreme Court has acknowledged, in certain circumstances, that "the Court of Chancery, in making its determination of a person's status as a stockholder of record, is empowered to examine all pertinent evidence with the view of reaching a determination of where justice lies."[61]

Vice Chancellor Glasscock expanded on the sound reasoning underlying this framework in *Knott Partners L.P. v. Telepathy Labs, Inc.*, where he explained:

> There is great value in allowing corporations to rely on the stock ledger in responding to purported demands by record stockholders under Section 220. Any wholesale departure from this rule would involve

---

[59] *Knott P'rs L.P. v. Telepathy Labs, Inc.*, 2021 WL 5493092, at *4 (Del. Ch. Nov. 23, 2021) (citation modified); *see also Viele v. Devaney*, 679 A.2d 993, 999 (Del. Ch. 1996) ("The stock certificate is strong evidence that [the named party] owned those shares.").

[60] 8 *Del. C.* § 220(c) (Aug. 1, 2010) (amended Mar. 24, 2025).

[61] *Rainbow Nav., Inc. v. Pan Ocean Nav., Inc.*, 535 A.2d 1357, 1359 (Del. 1987) (citation modified); *cf. Pogue v. Hybrid Energy, Inc.*, 2016 WL 4154253, at *3–4 (Del. Ch. Aug. 5, 2016) (holding "that inclusion on a stock ledger is *prima facie* evidence of stock ownership, but . . . the corporate defendant may rebut that presumption by clear and convincing evidence" and questioning, and declining to follow, *Rainbow*).

great potential for mischief and inefficiency. It would, moreover, be incompatible with the required strict reading of the statute.[62]

But he went on to explain that "[t]hese considerations cannot amount to a license for corporations to manipulate their stock ledgers to frustrate inspection rights[.]"[63] Looking at the suspicious facts before him, he held:

> [W]here a corporation has failed to update its stock ledger to reflect a new stockholder on a date certain, but is otherwise aware of the *bona fides* of the stockholder's status as of that date, *and concedes in documentation circulated outside the corporation that the same entity was in fact a stockholder as of that date*, that corporation cannot rely on the deficient stock ledger to deprive the stockholder of its inspection rights under Section 220.[64]

This type of inequitable positioning is also what compelled Vice Chancellor David, as then-Magistrate in Chancery, to look deeper than a purported stock cancellation in *Myers v. Academy Securities*.[65] Therein, the corporate defendant conceded that the plaintiff was a stockholder at one time, but argued that his shares were properly cancelled before he served his demand for books and records.[66] Looking at the evidence before her, the Vice Chancellor disagreed. In her post-trial

---

[62] *Knott P'rs*, 2021 WL 5493092, at *6.

[63] *Id.*

[64] *Id.* (emphasis in original).

[65] 2023 WL 4782948, at *1 (Del. Ch. July 27, 2023), *adopted*, (Del. Ch. 2023); *accord Holtzman v. Gruen Hldg. Corp.*, 1994 WL 444756, at *2–3 (Del. Ch. Aug. 5, 1994) (acknowledging that this Court can look deeper when "reason appears to question [a ledger's] authenticity or accuracy").

[66] *Academy Sec.*, 2023 WL 4782948, at *8.

ruling, she showed how the defendant's justifications continued to shift in incredulous ways and the evidence supporting any bases for cancellation was weak.[67] She thus concluded that the shares were not validly cancelled, and the plaintiff remained a stockholder with standing to seek a court-ordered inspection.[68]

The Plaintiff's reliance on *Academy Securities* is understandable. Like *Academy Securities*, the Defendant, here, also has a stock ledger which does not list the Plaintiff as a stockholder, solely because of a cancellation initiated by the Defendant.[69] But the similarities end there. Unlike in *Academy Securities*, the reason for the cancellation here is clear, consistent, and valid—the parties entered into a binding separation agreement (the Agreement, as earlier defined), through which the Plaintiff agreed to "hand back" his shares; when he did not do so affirmatively, the Defendant did so for him through the cancellation. Such was the natural next step to consummate the parties' transaction. Through that transaction, and as of September 4, at the latest, the Plaintiff was no longer a stockholder, and he therefore lacks standing.

---

[67] *Id.* at *11.

[68] *Id.*

[69] *See* JX55 (stock ledger as of March 5, 2025).

### 1. The parties agreed to the Plaintiff's separation from the Defendant, which included the return of his shares.

The Plaintiff contends the Agreement is not binding and makes several arguments against its validity or enforceability. I address and reject them in turn.

First, the Plaintiff argues that the Agreement was not final because he did not sign the final documents. Not so. By June 19, the parties had agreed on all material terms in the Agreement.[70] It does not matter that the drafts were not signed, because the parties' agreement was not expressly conditioned on memorialization. "Generally, when parties to a contract have agreed on all substantial terms of the contract and intend to be bound, the fact that one of the parties understood that the contract should be formally drawn up and put in writing does not leave the transaction incomplete" unless the parties had "a positive agreement that it should not be binding until so reduced in writing and formally executed."[71] The evidence before me reflects no such positive agreement.

Second, the Plaintiff is incorrect that the "inconsistencies in the characterization of what was contemplated consideration for shares versus consulting service compensation"[72] reflect that there was no meeting of the minds.

---

[70] *See* JX23.

[71] *Schwartz v. Chase*, 2010 WL 2601608, at *8 (Del. Ch. June 29, 2010).

[72] D.I. 27 at 14.

There is no material inconsistency regarding the role or purpose of the $50,000.00 payment, and the evidence reflects a clear meeting of the minds.

Under Delaware contract law, "[t]o form an enforceable contract, the parties must have a meeting of the minds on all essential terms."[73] Whether they have, and whether they "manifested an intent to be bound is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent."[74] My "inquiry is whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that agreement concluded the negotiations."[75]

The answer, here, is "yes." The parties' email communications reflect a meeting of the minds on all essential terms, to which the Plaintiff objectively manifested his intent to be bound. Those communications are clear and direct about the terms of the Agreement. The "get" and the "give" was equally clear; the Plaintiff would get $50,000.00 over two months, several clients and employees (a carve out

---

[73] *Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *16 (Del. Ch. Aug. 21, 2019), *judgment entered*, (Del. Ch. 2019).

[74] *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sep. 30, 2014) (citation modified).

[75] *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017), *judgment entered*, (Del. Ch. 2019) (citation modified).

from his non-compete and non-solicit), and relief from the guaranty, and he would "give" to the Defendant—the Defendant's "get"—his stock, separating him from the business as it goes in a different direction. The Plaintiff confirmed his agreement to those terms several times both to the Defendant's representatives and third parties. He also expressly manifested that he would sign the documents drafted by the Defendant's counsel to memorialize the Agreement. The Plaintiff's attempt to segregate the Agreement into discreet pieces, whereby the $50,000.00 must be payable as either compensation or stock repurchase, is unavailing. The parties' global resolution, which I must interpret based on its plain meaning, did not tie the $50,000.00 to any specific "give," and was just another factor in the consideration.[76]

Third, the Plaintiff also appears to contest the sufficiency of the $50,000.00, if treated as consideration for his shares. At best, this argument is akin to buyer's remorse, in that the Plaintiff may now feel the deal was not a good one, particularly when compared to the Defendant's initial offer which would have valued his shares at $100,000.00. But that is no basis on which to undo the Agreement. After all, "[p]arties have a right to enter into good and bad contracts[;] the law enforces both."[77] And to the extent the Plaintiff is inviting me to judge the adequacy of the

---

[76] "When interpreting a contract, the court's role is to effectuate the parties' intent based on the parties' words and the plain meaning of those words." *Zimmerman v. Crothall*, 62 A.3d 676, 690 (Del. Ch. Jan. 31, 2013).

[77] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

consideration myself, I decline to do so; this Court limits its inquiry "into consideration to its existence and not whether it is fair or adequate. Mere inadequacy of consideration, in the absence of any unfairness or overreaching, does not justify" disregarding any otherwise binding agreement.[78]

Finally, the Plaintiff argues that because the parties continued to negotiate the complications of transitioning one final client, they never reached a final agreement. I disagree. The Plaintiff's June 19 email reflects that the parties had a plan to transition that client out of the Defendant but that "the paperwork of switching is more complicated compared to other clients."[79] Despite recognizing as much, the parties' objective manifestations demonstrate that the mechanics of that transfer were not material to the separation and the material terms were locked in.[80]

The Plaintiff's challenges fail, and the Agreement is binding. Through their email communications and board meetings, the parties reached agreement on all material terms of the Plaintiff's separation from the Defendant. Thereafter, the

---

[78] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation modified); *see also Glenn v. Tide Water Associated Oil Co.*, 101 A.2d 339, 344 (Del. Ch. 1953) ("A court of equity does not attempt to weigh the actual value nor to insist upon the equivalent in contracts, when each party had equal competence.").

[79] JX23.

[80] *See Eagle Force Hldgs. LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018) ("[A]ll essential or material terms must be agreed upon before a court can find that the parties intended to be bound by it and, thus, enforce an agreement as a binding contract. What terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential.") (citations omitted).

Plaintiff confirmed he would sign the drafts shortly. In doing so, he reaffirmed his unequivocal manifestation of assent to be bound. His change of mind, buyer's remorse, and litigation-induced arguments are unpersuasive and herein rejected.

## 2. The Agreement was fully consummated.

Not only did the Plaintiff enter into a binding agreement, but the Agreement was also fully consummated before the Plaintiff made the Demand and brought this action. The Plaintiff does not dispute that he (1) received the $50,000.00, (2) took clients and employees with him to his new enterprise, (3) is no longer personally bound as guarantor, and (4) had his shares cancelled by the Defendant. The only thing "missing" is (5), that the parties be separated and on their own way by September 1. The Plaintiff contests how (4) was accomplished and makes much of the "missing" (5); I address those arguments in turn.

The Plaintiff appears to argue that the Defendant was wrong to cancel his shares on its end. I struggle to understand this position. A material term in the Agreement was that the Plaintiff would "hand back" his shares. When everything else was complete and the shares were not "handed back," the Defendant was within its rights under the Agreement to cancel the shares on its end.

The Plaintiff also appears to argue that the delayed separation—September 4 instead of September 1—supports a finding that there was no binding agreement in the first place or the Agreement has not been timely completed, relieving him of the

23

consequences thereof. Not so. Merely stating a date in an agreement does not make such "of the essence."[81] Rather, "[t]he law presumes contracting parties are familiar with time of the essence clauses and that they know how to make time of the essence if they so desire, especially in contracts between sophisticated business entities[.]"[82] Absent such a provision, Delaware law implies a reasonable time.[83] Here, the Agreement was no expressly conditioned on September 1 as a drop-dead date. Further, September 4, as compared to September 1, was a reasonable separation date and provides no basis on which to rescind, void, or cancel the parties' agreement. The Agreement was fully consummated as of September 4.

### 3. The Plaintiff has failed to prove that he was a stockholder when he made the Demand and filed this action.

The Agreement was binding on the Plaintiff and fully consummated with the cancellation of his shares on September 4, 2024. That cancellation was appropriate, and the Plaintiff has not provided any basis on which I should declare it otherwise. With that cancellation, the Plaintiff was no longer a stockholder of the Defendant and he has, therefore, failed to meet his burden to prove standing to seek a court-ordered inspection under Section 220.

---

[81] *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *10 (Del. Ch. May 2, 2007).

[82] *Id.*

[83] *Id.*

**B.** **Each side should bear its own fees under the American Rule, but costs should be shifted in the Defendant's favor.**

Through the pre-trial order, the parties each asked that I shift fees in their favor. I see no basis to do so. I do, however, deem the Defendant the overall "prevailing party," and accordingly shift costs in its favor.

"Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[84] Conversely, under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs."

In short, the briefing and trial presentations are devoid of any legal argument or support from which I can find an exception to the American Rule. But the Defendant is "the party who successfully prevail[ed] on the merits of the main issue"[85] making it the prevailing party entitled to recover its costs.

## III. CONCLUSION

For these reasons, the Plaintiff lacks standing to pursue relief in this action and his complaint should be dismissed. The parties should meet and confer about the costs shifted to the Defendant and, if they are unable to agree, the parties can submit

---

[84] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005).

[85] *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011) (emphasis in original).

competing proposals. I will not delay, however, the time for exceptions pending a final decision on costs; I have designated this a final report, and exceptions may be filed under the expedited schedule in Court of Chancery Rule 144(d)(2).